## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PKG CONTRACTING, INC.,

      Plaintiff,

      v.                           Case No. 20-CV-2646-JAR-KGG

SMITH & LOVELESS, INC.,

      Defendant.

## MEMORANDUM AND ORDER

Plaintiff PKG Contracting, Inc. ("PKG") filed this promissory estoppel action, alleging that it reasonably relied upon a subcontractor bid submitted by Defendant Smith & Loveless, Inc. ("Smith & Loveless") to provide wastewater treatment equipment as part of a construction project for a new wastewater treatment plant and facility. Before the Court is Smith & Loveless' Motion for Summary Judgment (Doc. 117). The motion is fully briefed and the Court is prepared to rule. For the reasons stated below, the Court denies Smith & Loveless' motion.

### I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such

---

[1] Fed. R. Civ. P. 56(a).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[6]  Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]  In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[10]  A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[11]  A genuine issue of material facts must

---

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Adler*, 144 F.3d at 670 (citing *Anderson*, 477 U.S. at 248).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[8] *Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670–71).

[10] *Adler*, 144 F.3d at 671.

[11] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

be supported by "more than a mere scintilla of evidence."[12]  Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[13]  "At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences."[14]

## II.   Uncontroverted Facts

As an initial matter, PKG has failed to comply with D. Kan. Rule 56.1(b)(1), which requires the nonmovant to state for each numbered statement whether the fact is controverted or uncontroverted.  PKG ignores Smith & Loveless' statement of uncontroverted facts and asserts its own.  Smith & Loveless requests the Court deem its statement of uncontroverted facts as admitted pursuant to D. Kan. Rule 56.1(a), and responds to PKG's statement of facts in its reply as required by the Rule 56.1(c).  Although burdensome, the Court will not deem all of Smith & Loveless' facts uncontroverted but will keep in mind the applicable summary judgment standards in determining the facts for purposes of this motion, many of which the parties have stipulated to or are evidenced by the documents at issue.

The following material facts are either uncontroverted, stipulated, or viewed in the light most favorable to PKG.  The Court does not consider facts presented by the parties that the record does not support or that are not relevant to the legal issues presented.  Nor does the Court consider legal arguments included in the parties' statements of fact.

---

[12] *Black v. Baker Oil Tools, Inc.*, 107 F.3d 1457, 1460 (10th Cir. 1997).

[13] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

[14] *Bacon v. Great Plains Mfg., Inc.*, 958 F. Supp. 523, 526 (D. Kan. 1997) (citation omitted).

### The Parties

PKG is a water and wastewater treatment general contractor, located in Fargo, North Dakota.  Smith & Loveless is a manufacturer and seller of wastewater treatment equipment, including package wastewater treatment plants, located in Lenexa, Kansas.

Former defendant/third-party plaintiff MNX, Inc. ("MNX"), is an independent manufacturer's sales representative for roughly thirty different manufacturers of wastewater treatment equipment, including Smith & Loveless.[15]  The November 11, 2016 Private Development Sales Representation Agreement between MNX and Smith & Loveless provides in relevant part that MNX acted as the "sales representative for the sale of [Smith & Loveless] products described in Exhibit A and AA attached . . ." for Minnesota, South Dakota, and North Dakota, and that "[a]s to [Smith & Loveless], [MNX ] is strictly an independent contractor and is not an employee or agent for any purposes whatsoever."[16]

### The Powder House Pass Wastewater Project

The Powder House Pass Wastewater Treatment Project (the "Project") is located in Lead, South Dakota.  Powder House Pass is a new, private residential development near Deadwood, South Dakota.  The Project included the construction and installation of a new wastewater treatment plant and facility, along with other infrastructure.  PKG was one of four bidding contractors on the Project.

On July 18, 2017, MNX provided a cover letter and copy of the five-page Smith & Loveless proposed Sales Agreement for the sale of one packaged Smith & Loveless Aerobic FAST® Treatment System ("Sales Agreement") to PKG and other bidding contractors for the

---

[15] MNX was dismissed upon stipulation of the parties on March 3, 2021.  Doc. 94.

[16] Doc. 116, ¶ 2(b); Doc. 121-4.

project.[17]  The MNX cover letter states: "[t]his proposal/quotation is void at our option unless accepted by you in accordance with our terms and conditions of sale within 30 days from the bid date."[18]

The proposed Sales Agreement sets forth Smith & Loveless' scope of supply and the terms and conditions of the sale of the FAST® Treatment System, which differed in various respects from the June 2017 Project Specifications,[19] including: (1) no provision for two-year warranty; (2) FOB factory rather than job site; (3) no provision for certain equipment features; and (4) standard rather than high-performance painting and coating.[20]  The Sales Agreement states that "[p]ricing is firm for 60 days from the date of this proposal."[21]  The Sales Agreement further states in relevant part, that the agreement is not binding on Smith & Loveless unless signed by PKG and that the agreement constitutes the entire contract between the parties.[22] Other provisions of the Sales Agreement include: (1) start-up/training one trip; (2) payment terms of 10% with order; 20% upon submission of submittal documentation; 20% on release to production; 40% Net 30 days from shipment; 10% at start up not to exceed 90 days; and (3) manufacturing completion estimated at 28 weeks after receipt of approved submittals.[23]

---

[17] Doc. 118-10.

[18] Doc. 118-3.

[19] Doc. 121-1.

[20] *Compare* Project Specifications, Doc. 121-1 ¶¶ 1.06(B), 1.07, 3(d), 3(i), and 6(e), *with* Sales Agreement, Doc. 118-10.

[21] Doc. 118-10 at 3.

[22] *Id.*

[23] *Id.*

On July 20, 2017, MNX emailed PKG stating the purchase price for the Smith & Loveless treatment equipment was $325,416.[24]  That afternoon, PKG submitted a bid to the owner of the Project for $1,569,000.

A series of emails was subsequently exchanged between Mike Sikorski, PKG's project engineer, Michael Mathers, PKG's project manager, and Mark Enochs at MNX.  On July 31, 2017, Sikorski emailed Enochs to inquire whether there were "money saving avenues" to reduce the price for the Smith & Loveless FAST® Treatment System, specifically whether it would cost less to put a catwalk down the center of each tank instead of covering the entire system with grating.[25]  Enochs responded on August 4, 2017 that they were looking into this option and would get back to him.[26]  On August 9, Sikorski emailed Enochs to inquire whether Smith & Loveless would give PKG a price for adding handrail to the perimeter and to again ask if Smith & Loveless had any cost saving ideas.[27]

On August 14, 2017, PKG was awarded the contract for the Project.[28]  At 4:45 p.m. on August 15, 2017, Enochs emailed Sikorski: "Just talked with Smith & Loveless.  They're still looking at cost reduction options, mainly with controls.  We may want to set up a conference call with you, the Engineer, and Smith & Loveless, but I'll let you know if it seems to make sense. I'll get back to you when I hear more."[29]  Sikorski immediately replied, "I just heard yesterday, that they recommended award of the project, so you may just want to hold tight."[30]  Enochs

---

[24] Doc. 118-5.

[25] Doc. 118-18.

[26] *Id.*

[27] Doc. 118-19.

[28] Doc. 121-2.

[29] Doc. 121-3.

[30] *Id.*

replied at 4:53 p.m,, stating "Excellent! I may keep [Smith & Loveless] looking at options should they be needed, and will coordinate with you," and asked for a production schedule "so we can be sure to meet your timeline."[31]  The next day, Enochs emailed Sikorski to inform him that Smith & Loveless could do the handrails on the tanks for $9,500, and that they were still looking into the controls.[32]  On August 26, 2017, Enochs emailed Sikorski to thank him for the call that morning confirming that the Smith & Loveless treatment system would be used in the Project.[33] Enochs requested a purchase order be sent to Smith & Loveless, care of MNX, requested a desired delivery date, installation date, and any other schedule items they should be aware of, and said that he would get back to Sikorski to confirm production schedules and to answer his question about whether welding to the top of the tank wall is acceptable.[34]  Later that day, Enochs emailed Mathers to state that Smith & Loveless noted that welding to the top of the tanks can damage the factory paint coating and requested feedback on what PKG had in mind for the grating so they could evaluate options.[35]

On September 6, 2017, Enochs emailed Mathers, stating that they were ready to start the submittal process and were awaiting a purchase order.[36]  Mathers emailed Enochs stating the hard copies of the purchase order would be out the following week and the electronic copies

---

[31] *Id.*

[32] Doc. 121-4.

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

would be sent out prior to then.[37]  Enochs replied that he would watch for the purchase order and attached drawings and a picture, as requested.[38]

On September 14, 2017, PKG submitted its purchase order to MNX for a Section 46 30 02 Factory Built Wastewater System ("Purchase Order").[39]  The price listed for the wastewater equipment was $325,416, plus 4.5% sales tax of $14,642.72, for a total of $340,059.72.  PKG did not reference the Sales Agreement in or tender payment for 10% of the purchase price along with its Purchase Order.  Sikorski stated that it is PKG's custom and practice or "standard procedure" to issue its standard purchase order to vendors or subcontractors, rather than sign vendors and subcontractors' proposed contracts as part of the "negotiation" process.[40]

While the Purchase Order matched the $325,416 bid price, it contained different terms than the Sales Agreement, including: (1) payment terms 90%, Net 30–45 days after delivery, balance of retainage to be paid upon successful completion of startup and acceptance by owner; (2) FOB job site; (3) purchase is for a Section 46 30 02 Factory Built Wastewater System, all complete and in full compliance with plans and specifications; (4) seller warrants and guarantees all materials as required by the specifications; (5) terms and conditions of the Purchase Order constitute the entire contract between PKG and Smith & Loveless; (6) delivery date per PKG schedule, with shipping date to be issued by PKG office; (7) two-trip minimum for start-up; (8) back charges for storage and handling if Smith & Loveless ships the equipment earlier than PKG's scheduled shipping date; and (9) any default remedy at Smith & Loveless' expense.[41]

---

[37] *Id.*

[38] *Id.*

[39] Docs. 121-5, 118-12

[40] Doc. 118-3.

[41] Doc. 118-12.

The Purchase Order also references Exhibit "A" to become part of the agreement, which was not attached.[42]

On October 17, 2017, Enochs provided to PKG a letter from Smith & Loveless dated October 16, 2017, confirming a prior telephone conversation with PKG on October 10, 2017, that Smith & Loveless could not accept PKG's Purchase Order for $325,416.[43]  The letter stated that if Smith & Loveless accepted a contract per project specification, the bid should have been $483,102; further, Smith & Loveless could accept a contract to meet project specifications, but the new price would be $420,096.00.  Smith & Loveless also offered various options to reduce the purchase price of the Smith & Loveless equipment, such as eliminating blower and blower controls and using Smith & Loveless' standard controls.

A month later, on November 17, 2017, MNX emailed PKG to express its frustration with Smith & Loveless and to advise that Smith & Loveless would sell the FAST® Treatment System, as specified in its Scope of Supply set forth in the Sales Agreement, for $390,000—approximately $65,000 above the bid day proposal—which PKG declined.[44]  In a letter dated November 20, 2017, Smith & Loveless advised PKG's counsel that PKG had failed to timely sign and return the proposed Sales Agreement and that Smith & Loveless considered the Purchase Order, with its purported acceptance on terms other than those originally offered in the Sales Agreement, to be a counteroffer.[45]

PKG then issued a purchase order to Entex Technologies, Inc. on December 4, 2017, for the purchase of an alternative wastewater treatment system for the Project, for the purchase price

---

[42] *Id.*

[43] Doc. 118-15, 18-22.

[44] Doc. 118-13.

[45] Doc. 118-16.

of $237,842.  Due to change orders and cost overruns, PKG claims it incurred additional costs of $189,107.24 for the Entex as-built wastewater treatment system.

### *The Box Elder Project*

In or about 2013, Smith & Loveless sold and supplied PKG with wastewater treatment equipment in connection with the Box Elder Wastewater Treatment Project, located in South Dakota.  On August 4, 2013, Smith & Loveless wrote PKG to "acknowledge PKG's purchase order and that it incorporated the unexecuted Sales Agreement as a superseding document that constituted the entire agreement."[46]  The letter further stated that Smith & Loveless could not agree to or accept the payment terms and the project plans and specifications would be superseded by Smith & Loveless' approved submittals.  PKG signed and executed a copy of the August 4, 2013 letter, thereby acknowledging the terms and conditions agreed to by the parties.[47]

## III.    Discussion

The sole claim PKG asserts against Smith & Loveless in this case is for promissory estoppel.  The parties agree that the issues in this case are governed by the laws of the state of Kansas.[48]  To prevail on a theory of promissory estoppel under Kansas law, a plaintiff must establish: "(1) [t]he promisor reasonably expected the promisee to act in reliance on the promise, (2) the promisee acted as could reasonably be expected in relying on the promise, and (3) a refusal of the court to enforce the promise would sanction the perpetration of fraud or result in other injustice."[49]  "Promissory estoppel commonly applies when a promise reasonably induces a

---

[46] Docs. 121-9, 121-10.

[47] *Id.*

[48] Doc. 116 at 2.

[49] *Mohr v. State Bank of Stanley*, 770 P.2d 466, 481 (Kan. 1989).

predictable sort of action but without the more formal mutual consideration found in contracts."[50] "Promissory estoppel and contract law are closely related and serve the same fundamental purposes by providing means to enforce one party's legitimate expectations based on the representations of another party."[51] "Kansas courts have explained that a party's *reasonable* reliance on a promise prompting a *reasonable* change in position effectively replaces the bargained for consideration of a formal contract, thereby creating what amounts to a contractual relationship."[52] Reasonable reliance typically reflects a fact question reserved for the factfinder.[53]

The doctrine of promissory estoppel has been invoked to protect contractors from withdrawal of sub-bids relied upon in preparation of the prime bid. The leading case applying promissory estoppel in this context is *Drennan v. Star Paving Co.*[54] In that case, the California Supreme Court held that in cases where a subcontractor has submitted a bid to a general contractor for use in a prime bid, the contractor may invoke the theory of promissory estoppel in order to prevent the subcontractor from revoking its bid, despite the absence of a binding contract.[55] Instead, "a subcontractor who makes a bid to a general contractor binds itself to perform according to its promise because the general contractor has relied on that promise in making its own bid."[56] The court explained that promissory estoppel operates to keep a subcontractor's bid open until the general contractor has had a reasonable opportunity to accept

---

[50] *Bouton v. Byers*, 321 P.3d 780, 787 (Kan. Ct. App. 2014).

[51] *Id.* (citing Restatement (Second) of Contracts § 90, comment a).

[52] *Id.* (citing *Berryman v. Kmoch*, 559 P.2d 790, 793 (Kan. 1977)).

[53] *Id.* at 788 (citations omitted).

[54] 333 P.2d 757 (Cal. 1958).

[55] *Id.* at 759–60.

[56] *Foley Co. v. Warren Eng'g, Inc.*, 804 F. Supp. 1540, 1545 (N.D. Ga. 1992) (construing *Drennan*, 333 P.2d at 759–60).

or reject it.[57]  It does not, however, permit the general contractor to "reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer."[58] "Unless the acceptance is unconditional and without variance from the offer it is of no legal effect as an acceptance and operates as a rejection and a counteroffer."[59]

While Kansas courts have long recognized and applied the promissory estoppel doctrine, it has not applied the doctrine or the so-called *Drennan* rule in a subcontractor bid dispute.  Thus, it is this Court's task to predict how the Kansas Supreme Court would rule.[60]  To make this prediction, the Court looks to "lower state court decisions, decisions of other states, federal decisions, and the general weight and trend of authority."[61]

The Seventh Circuit has noted that "[t]he construction bidding process is a classic battleground for the application of promissory estoppel," and that *Drennan* is the seminal case on this topic.[62]  Many courts have determined the doctrine of promissory estoppel is applicable in disputes between contractors and subcontractors and apply the *Drennan* rule to protect contractors against withdrawal of sub-bids relied upon in preparation of the contractor's bid prior to the expiration of the firm bid period.[63]  Relevant here, the Seventh Circuit further noted that

---

[57] *Drennan*, 333 P.2d at 760.

[58] *Id.*

[59] *APAC-Southeast, Inc. v. Coastal Caisson Corp.*, 514 F. Supp. 2d 1373, 1379 (N.D. Ga. 2007) (quoting *Peerless Cas. Co. v. Hous. Auth. of Hazelhurst*, 228 F.2d 376, 379 (5th Cir. 1955)).

[60] *See Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 930–31 (10th Cir. 2018).

[61] *Id.* (brackets and internal quotation marks omitted).

[62] *C.G. Schmidt, Inc. v. Permasteelisa N. Am.*, 825 F.3d 801, 807 (7th Cir. 2016) (applying Wisconsin law).

[63] *See, e.g.*, *Weitz Co., LLC v. Hands, Inc.*, 882 N.W.2d 659, 668–69 (Neb. 2016) (holding subcontractor liable to a contractor under doctrine of promissory estoppel); *Dynalectric Co. of Nev., Inc. v. Clark & Sullivan Constr., Inc.*, 255 P.3d 286, 289–91 (Nev. 2011) (upholding an award of $2.5 million on a contractor's promissory estoppel claim against a subcontractor that refused to honor its sub-bid and enter into a subcontract); *Double AA Builders, Ltd. v. Grand State Constr.*, 114 P.3d 835, 838–41 (Ariz. Ct. App. Div. 1 2005) (invoking doctrine of promissory estoppel to hold a subcontractor to its bid); *Riley Bros. Constr., Inc. v. Shuck*, 704 N.W.2d 197, 202–05 (Minn. Ct. App. 2005) (holding subcontractor to its bid and that the contractor had a reasonable amount of time to

"courts generally distinguish cases in which a general contractor attempts to renegotiate the subcontractor's bid, a practice known as 'bid chiseling.'"[64]  As *Drennan* noted, "a general contractor is not free to delay acceptance after he has been awarded the general contract in the hope of getting a better price.  Nor can he reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer."[65]  When a general contractor reopens bidding with the subcontractor, promissory estoppel may be denied on several grounds, including lack of reliance or rejection by a counter-offer.[66]  "By limiting the application of promissory estoppel, the general contractor can either keep the subcontractor's bid open for a reasonable amount of time or seek a better deal, but not both."[67]

The Kansas Supreme Court has held that "[a] bid in response to a solicitation constitutes no more than an offer and, until its acceptance, a contract does not exist."[68]  Kansas courts also recognize the general rule that an acceptance of a contract must mirror the terms of an offer; a conditional acceptance is a counteroffer that rejects the original offer.[69]  Accordingly, the Court predicts that the Kansas Supreme Court would follow the majority *Drennan* rule and approach in a subcontractor bid dispute involving a claim of promissory estoppel.

---

accept bid after being awarded general contract); *Pickus Constr. & Equip. v. Am. Overhead Door*, 761 N.E.2d 356, 361–63 (Ill. 2001) (applying promissory estoppel).

[64] *C.G. Schmidt*, 825 F.3d at 808 (citing CORBIN ON CONTRACTS, § 2.31 (2015) ("[I]t is generally agreed that the general contractor cannot, after being awarded the contract, reopen the bidding with the subcontractors to chisel down the bids, while at the same time maintaining that the low-bidding subcontractor remains liable.")).

[65] *Drennan v. Star Paving Co.*, 333 P.2d 757, 760 (Cal. 1958).

[66] *See Preload Tech., Inc. v. A.B & J. Constr.  Co.*, 696 F.2d 1080, 1089 (5th Cir. 1983).

[67] *C.G. Schmidt*, 825 F.3d at 808.

[68] *Sutter Bros. Constr. Co. v. City of Leavenworth*, 708 P.2d 190, 196 (Kan. 1985).

[69] *Lindsey Masonry Co. v. Murray & Sons Constr. Co.*, 390 P.3d 56, 64 (Kan. Ct. App. 2017) (citing *U.S.D. No. 446 v. Sandoval*, 286 P.3d 542 (Kan. 2012)).

With this framework in mind, the Court proceeds to examine the parties' arguments. Smith & Loveless argues that PKG cannot establish the necessary elements for its promissory estoppel claim because PKG (1) waived its claim when it responded with the Purchase Agreement instead of an executed Sales Agreement, and (2) did not act reasonably in reliance on the Smith & Loveless Sales Agreement quotation.  Smith & Loveless contends that it was unreasonable for PKG to rely solely on the price in the sub-bid while ignoring the terms and conditions stated therein, which it urges were material to the bid price itself, and whether a mistake was made in preparing the sub-bid is irrelevant.  PKG contends that it relied on Smith & Loveless' proposed Sales Agreement quotation of $325,416 for the FAST® Treatment System when PKG submitted its bid to and entered into a contract with the Project Owner.  PKG further claims that after the Project was awarded to PKG, Smith & Loveless determined that it had made a mistake in its bid and price quotation, and declined to provide a product meeting the specifications as required by the Project Owner.  PKG asserts that it need only establish that it relied on Smith & Loveless' pricing to succeed on its promissory estoppel claim, and that it is industry custom and practice to further negotiate subcontract agreements once the general contractor is awarded the contract as evidenced by the parties' continued negotiations in this case and prior dealings in the Box Elder Project.

As illustrated by the many cases considering promissory estoppel claims in the context of subcontractor bid disputes, the Court finds that these issues require factual determinations inappropriate for resolution on a cold summary judgment record.[70]  Central to the Court's determination of these issues is whether PKG relayed its acceptance of Smith & Loveless' sub-

---

[70] *See, e.g.*, *Flintco Pac., Inc. v. TEC Mgmt. Consultants, Inc.*, 1 Cal. App. 5th 727, 736 (Cal. Ct. App. 2016) (explaining whether a general contractor is entitled to rely upon a proposed subcontractor bid must be decided on the basis of the facts of the particular case before the court) (citation omitted).

bid unconditionally and then submitted what may have been a non-conforming written Purchase

Order, or whether PKG responded to Smith & Loveless' sub-bid with the non-conforming

Purchase Order.[71]  If the former, PKG arguably preserved a promissory estoppel claim, which

would not be waived by a subsequent dispute over the terms of the proposed Purchase Order.[72]

If the latter, PKG arguably rejected Smith & Loveless' sub-bid and consequently, waived a

promissory estoppel claim.[73]  On the record before it, the Court cannot conclude that a rational

trier of fact could reach only one conclusion based upon the evidence, precluding summary

judgment on PKG's promissory estoppel claim.

   **IT IS THEREFORE ORDERED BY THE COURT** that Defendant Smith & Loveless'

Motion for Summary Judgment (Doc. 117) is **denied**.

   **IT IS SO ORDERED**.

   Dated: <u>April 6, 2022</u>

          S/ Julie A. Robinson
         JULIE A. ROBINSON
         UNITED STATES DISTRICT JUDGE

---

[71] *See APAC-Southeast, Inc. v. Coastal Caisson Corp.*, 514 F. Supp. 2d 1373, 1379–80 (N.D. Ga. 2007) (explaining distinction between acceptance and rejection of subcontractor bid under these circumstances) (citing *Peerless Cas. Co. v. Hous. Auth. of Hazelhurst,* 228 F.2d 376, 379 (5th Cir. 1955)); *accord C.G. Schmidt, Inc. v. Permasteelisa N. Am.*, 825 F.3d 801, 808–09 (7th Cir. 2016).

[72] *APAC-Southeast, Inc.*, 514 F. Supp. 2d at 1379–80.

[73] *Id.*