**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **PKG CONTRACTING, INC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**SMITH & LOVELESS, INC.,**<br><br>**Defendant.** | **Case No. 2:20-CV-02646-JAR** |

**FINDINGS OF FACT AND CONCLUSION OF LAW**

Plaintiff PKG Contracting, Inc. ("PKG") filed this promissory estoppel action alleging that it reasonably relied upon a subcontractor bid submitted by Defendant Smith & Loveless, Inc. ("Smith & Loveless") to provide wastewater treatment equipment as part of a construction project for a wastewater treatment plant and facility. After the Court denied Smith & Loveless' Motion for Summary Judgment,[1] a day-long bench trial was held September 12, 2022. After hearing and carefully considering the arguments, evidence, and testimony presented by the parties at trial, the Court now issues its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a). For the reasons explained below, the Court grants judgment in favor of Smith & Loveless.

## I. Findings of Fact

The Court incorporates the stipulations set forth in the Pretrial Order and in the Memorandum and Order denying summary judgment to the extent they are relevant and are not explicitly recited herein. The Court also makes additional findings based on the parties' stipulations, as well as evidence and testimony presented at the bench trial.

[1] Doc. 125.

PKG is a general contractor of water and wastewater treatment, located in Fargo, North Dakota. Smith & Loveless is a manufacturer and seller of wastewater treatment equipment, including package wastewater treatment plants, located in Lenexa, Kansas. Smith & Loveless enlisted MNX, Inc. ("MNX") as an independent manufacturer's sales representative. Under the Private Development Sales Representation Agreement between MNX and Smith & Loveless, MNX acted as the "sales representative for the sale of [Smith & Loveless] products . . . listed in Exhibit A and AA hereof," and "[a]s to [Smith & Loveless], [MNX] is strictly an independent contractor and is not an employee or agent for any purposes whatsoever."[2]

Powder House Pass is a new, private residential development near Lead, South Dakota. The Powder House Pass Community Improvement District (the "Owner") solicited bids for the Powder House Pass Wastewater Project (the "Project"), including the construction and installation of a wastewater treatment plant and facility. The Owner enlisted Advanced Engineering and Environmental Services ("AE2S") to design and develop the Project. AE2S designed the specifications, Section 46 30 02 (the "Specifications"), for the Project's factory-built wastewater treatment in part around Smith & Loveless' equipment. In pertinent part, the Specifications provided:

> Drawing layouts, item weights and specification language for the factory built (sic) wastewater treatment system assemblies is based on Smith and Loveless. All structural, electrical, mechanical, instrumentation and controls modifications necessary due to using a different manufacturer shall be the responsibility of the Contractor at no additional cost to the Owner.[3]

The Specifications then went out to four bidders, including PKG.

---

[2] Ex. 803, ¶ 2, ¶ 15.

[3] Ex. 804, ¶ 1.05(D).

PKG's President, Darin Pfingsten, testified that preparing to bid on a project is a lengthy process, and contractors work up until the last few minutes of the bid time. The general contractor reviews the specifications and quantities to estimate labor, material, and subcontractor costs. After reviewing the project's needs, the general contractor solicits sub-bids for various aspects of the specifications. The sub-bids come in ranging from 24 hours in advance to ten minutes before the bid is due. A lead estimator is responsible for making sure each aspect of the specifications is covered. The lead estimator then fills the sub-bids into the bid form, calculates the prime bid number, and submits the prime bid within minutes of the actual bid time.

In preparation for its bid to become the Project's general contractor, PKG solicited bids from subcontractors. On July 18, 2017, MNX President Mark Enochs provided PKG with its cover letter and a copy of Smith & Loveless' proposed Sales Agreement for the sale of one packaged Smith & Loveless Aerobic FAST® Treatment System ("Sales Agreement"). The MNX cover letter states: "[t]his proposal/quotation is void at our option unless accepted by you in accordance with our terms and conditions of sale within 30 days from the bid date."[4] To accept Smith & Loveless' sub-bid, the Sales Agreement required the general contractor to sign the agreement and tender 10% of the purchase price. The Sales Agreement then set forth Smith & Loveless' scope of supply. It also contained the terms and conditions of sale and a merger clause. The Sales Agreement provided that contractors would receive a quote price by July 20, 2017, and that "[p]ricing is firm for 60 days from the date of this proposal."[5]

---

[4] Ex. 807 at 2.

[5] Ex. 809 at 3.

On July 19, 2017, Smith & Loveless quoted a purchase price of $275,000 for its FAST® Treatment System, which Enochs provided to Mike Sikorski, a PKG project manager. Isaiah LaRue, a Smith & Loveless' sales engineer, reviewed its quoted price the next day and realized the price did not account for the price of the effluent aeration blowers and sludge storage blowers, an essential item. Blowers prepare the wastewater for purification by fanning oxygen into various compartments of the treatment system, which enhances the biological growth of organisms that consume various parts of wastewater.

LaRue informed Enochs that Smith & Loveless could not honor the original price and provided a new purchase price of $325,416, which Enochs relayed to Sikorski. That evening, PKG incorporated Smith & Loveless' proposal for $325,416 into its bid and submitted it to the Owner. On August 14, 2017, the Owner awarded PKG the bid. On August 25, 2017, PKG Project Manager Michael Mathers called Enochs to confirm the Smith & Loveless treatment system would be used in the project and to seek Enochs' direction on writing the purchase order.

On September 14, 2017, Mathers sent Purchase Order 1714-08 (the "Purchase Order") to Enochs at MNX. The next day, Enochs responded that he "would have [the Purchase Order] signed and emailed back to [PKG]."[6] Enochs then forwarded the Purchase Order to Smith & Loveless. John Colfax, manager of Smith & Loveless' contracts and credit department, testified that Smith & Loveless was not in receipt of the Purchase Order until September 22, 2017, when the Purchase Order was marked with a "received" stamp.

The Purchase Order was unsigned, and PKG did not tender 10% of the purchase price as called for by the Sales Agreement. The Purchase Order was a standard subcontract form that PKG commonly used. Pfingsten testified that PKG's "standard procedure" and the industry

[6] Ex. 816 at 1.

custom was to issue standard subcontracts as part of the negotiation process. These standard subcontracts, Pfingsten explained, contain terms and conditions which favor the party that wrote them. After submitting standard subcontract forms, Pfingsten testified, the two parties generally negotiate over the terms and conditions before reaching a final subcontract agreement.

The Purchase Order, however, varied from the Sales Agreement regarding both scope and terms and conditions. The Purchase Order required the wastewater system to be "all complete and in full compliance with the plans and specifications."[7] Among other items, the Specifications required variable frequency drives ("VFDs") to control the speed of the blowers:

> Motor circuit protector (MCP) – type circuit breakers, variable frequency drives (VFDs) (26 09 15) and/or FVNR combination motor starters (26 29 13) for all process motors (blowers, pumps, etc.) and thermal magnetic-type circuit breakers for all other non-motor loads (UV system, XFMR-LP-01 Primary, etc.) as indicated on the Electrical Drawings.[8]

To cool the VFDs, the Specifications required two "PP1-CC enclosure mounted air conditioning systems."[9] Furthermore, the Specifications called for a separately mounted lighting panel, high performance painting and coating, and a cellular modem for the SCADA system.

William Flores, Vice President of Municipal Treatment Systems at Smith & Loveless, testified that the Sales Agreement did not cover the full scope of the Specifications. Instead of the selections called for by the Specifications, the Sales Agreement proposed its standard options for the lighting panel, painting and coating, and cellular modem. The Sales Agreement also listed accessories and spare parts that were included, followed by a list of "items not included."[10] VFDs and air conditioning units, however, did not appear on either list. Flores testified that sales

---

[7] Ex. 817.

[8] Ex. 804, ¶ 2.13(A)(3)(d).

[9] *Id.* ¶ 2.13(A)(3)(i).

[10] Ex. 809 at 2.

agreements indicate everything subcontractors are including on the job. When a sales agreement does not explicitly include an item, Flores explained, the general contractors will follow-up to clarify the sales agreement's scope.

LaRue and Flores testified the Sales Agreement did not include VFDs or air conditioning units. Flores testified that the Smith & Loveless system consisted of only the internal components to make it operable. LaRue testified that VFDs are an optional item and that installation of VFDs would require additional labor and materials beyond the VFD mechanism. These include fabrication, programming, and a larger controls cabinet or multiple controls cabinets. These costs would increase a contract price between $50,000 to $100,000. None of these additional items were part of the scope of supply of the Sales Agreement. According to LaRue, it is common in this industry to set forth a lesser scope of supply than the full specifications.

While PKG did not follow up to clarify whether the Sales Agreement included VFDs and air conditioning units, Pfingsten contends that he believed the Sales Agreement covered them. Pfingsten testified that VFDs are an expensive item, and PKG installs VFDs on almost every job. Pfingsten then testified that the Sales Agreement did not appear to exclude VFDs and air conditioning units because they were not on the list of items not included. Had the Sales Agreement appeared to exclude VFDs, Pfingsten testified, PKG's estimators would have followed up.

In addition to the variances in scope, several terms and conditions of the Purchase Order varied the terms and conditions of the Sales Agreement, including warranty, place of delivery, start-up, and payment terms. The Sales Agreement contained: (1) no provision for two-year warranty; (2) FOB factory rather than job site; (3) start-up/training one trip; and (4) progress

payment terms of 10% with order, 20% upon submission of submittal documentation, 20% on release to production, 40% Net 30 days from shipment, 10% at start up not to exceed 90 days.[11] By contrast, the Purchase Order contained: (1) a provision for two-year warranty; (2) FOB job site rather than factory; (3) two-trip minimum for start-up; and (4) 90% of net payment in 30-45 days.[12]

Colfax testified that certain terms and conditions were material to the Sales Agreement, including place of delivery and payment terms. According to Colfax, place of delivery is a material term because it determines the point at which title transfers, which implicates income tax and risk of loss. Income tax must be paid to the state in which title transfers; and transferring title at the job site would require Smith & Loveless to pay income tax in South Dakota in addition to Kansas. Risk of loss transfers to the buyer at the transfer of title, and Smith & Loveless would maintain risk of loss through the transit if it delivered to the job site. Payment terms are material, Colfax explained, because Smith & Loveless finances the labor and materials for the custom-made FAST® Treatment System with the progress payments. Without progress payments, Smith & Loveless would have to finance the custom-made equipment itself, which is difficult on sales of this magnitude and this dollar value.

On October 17, 2017, Enochs provided Pfingsten with a letter from Smith & Loveless, stating that Smith & Loveless could not accept PKG's Purchase Order. Smith & Loveless wrote that it could not meet the Project's specifications for the purchase price of $325,416, and it would only accept a contract of that scope for $420,096. Smith & Loveless then offered various options to reduce the purchase price, including eliminating blowers and blower controls and

[11] Ex. 809 at 3–4.

[12] Ex. 817.

using Smith & Loveless' standard controls. When PKG rejected these options, Enochs discussed pricing options with LaRue and Flores. Smith & Loveless then offered to "provide the as-scoped treatment system for $390,000" on November 17, 2017—which PKG declined.[13]

On December 4, 2017, PKG purchased an alternative wastewater treatment system from Entex Technologies, Inc for $286,000. Because the original design revolved around the Smith & Loveless system, PKG incurred additional expense in developing and executing an alternate design. In lieu of the metal tank produced by Smith & Loveless, PKG constructed a concrete tank using the design and direction of an independent structural engineer. PKG incurred expenses in the amounts of $5,320 for the engineer's services and $45,000 for the rebar and concrete materials. To install the concrete tank, PKG retained subcontractors for the amount of $86,000. PKG incurred $21,600 in expenses arising from construction equipment, including fuel and freight charges. General field condition charges cost PKG the amount of $22,449. To recover its damages totaling $122,797.00, PKG filed this promissory estoppel action.

## II. Conclusions of Law

The sole claim asserted by PKG is for promissory estoppel. The Court has already determined that PKG's promissory estoppel claim arises under Kansas law.[14] The issues before the Court are whether PKG acted reasonably in reliance upon Smith & Loveless' sub-bid and alternatively, whether PKG preserved its promissory estoppel claim when it responded with the

[13] Ex. 14.

[14] Doc. 116.

Purchase Agreement that varied from the Sales Agreement. The Court concludes that PKG did neither, so its promissory estoppel claim fails.

### A. Legal Framework

Under the theory of promissory estoppel, a general contractor may recover damages incurred from its reasonable reliance on a withdrawn sub-bid. "Promissory estoppel is a doctrine by which courts view performance in reasonable reliance on a promise as sufficient to create a legally binding contract where a contract otherwise lacks consideration."[15] Reasonable reliance is a key element of promissory estoppel.[16] As Kansas courts have explained, promissory estoppel only applies when "a party's *reasonable* reliance on a promise prompt[s] a *reasonable* change in position."[17] Reasonable reliance is a fact question reserved for the factfinder.[18]

The Court also predicted that the Kansas Supreme Court would follow the so-called *Drennan* rule in a subcontractor bid involving a claim of promissory estoppel.[19] The leading case invoking the doctrine of promissory estoppel to protect contractors from withdrawal of sub-bids relied upon in preparation of the prime bid is *Drennan v. Star Paving Co.*[20] Under *Drennan*, a general contractor may invoke promissory estoppel to hold open a subcontractor's bid until the general contractor has a reasonable opportunity to accept or reject it.[21] Despite the absence of

---

[15] *Sch.-Link Techs., Inc. v. Applied Res., Inc.*, 471 F. Supp. 2d 1101, 1114 (D. Kan. 2007) (citing *Decatur Cnty. Feed Yard, Inc. v. Fahey*, 974 P.2d 569, 577–78 (Kan. 1999)).

[16] *Warkentine v. Salina Pub. Schs., Unified Sch. Dist. No. 305*, 921 F. Supp. 2d 1127, 1132–33 (D. Kan. 2013) (citing *First Nat. Bankshares of Beloit, Inc. v. Geisel*, 853 F. Supp. 1344, 1354 (D. Kan. 1994); Restatement (Second) of Contracts § 87(2)).

[17] *Bouton v. Byers*, 321 P.3d 780, 787 (Kan. Ct. App. 2014) (citing *Berryman v. Kmoch*, 559 P.2d 790, 793 (Kan. 1977)) (emphasis in original).

[18] *Id.* at 788 (citations omitted).

[19] Doc. 125 at 13.

[20] 333 P.2d 757 (Cal. 1958).

[21] *Id.* at 760.

consideration, "a subcontractor who makes a bid to a general contractor binds itself to perform according to its promise because the general contractor has relied on that promise in making its own bid."[22] Promissory estoppel does not, however, permit the general contractor to "reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer."[23] When a general contractor reopens bidding with the subcontractor, promissory estoppel may be denied on several grounds, including lack of reliance or rejection by a counter-offer.[24]

**B. Application**

Smith & Loveless contends that it was unreasonable for PKG to rely solely upon the bid price while ignoring the terms and conditions stated therein. PKG contends that it relied upon Smith & Loveless' sub-bid in calculating its own bid to the Owner, and that it is industry custom to further negotiate terms and conditions after the general contractor is awarded the contract.

In other states, courts have considered the purchase order in determining whether the general contractor reasonably relied upon a sub-bid. For example, in *Flintco Pacific v. TEC Management Consultants*, the California Court of Appeals held a general contractor did not reasonably rely on sub-bid when it used the sub-bid's price but ignored material elements of the sub-bid.[25] The purchase order differed from the sub-bid regarding liquidated damages and deposit requirement.[26] The general contractor argued that it relied upon the sub-bid's price, and

[22] *Foley Co. v. Warren Eng'g, Inc.*, 804 F. Supp. 1540, 1545 (N.D. Ga. 1992) (construing *Drennan*, 333 P.2d at 759–60).

[23] *Drennan*, 333 P.2d at 760 (citing *R. J. Daum Constr. Co. v. Child*, 247 P.2d 817, 823 (Utah 1952)).

[24] *See Preload Tech., Inc. v. A.B. & J. Constr. Co.*, 696 F.2d 1080, 1089 (5th Cir. 1983).

[25] 205 Cal. Rptr. 3d 21, 23 (Cal. Ct. App. 2016).

[26] *Id.* at 24.

that "price is the principal item," whereas terms and conditions are negotiated later.[27] The court determined it was unreasonable for the general contractor to rely on the bid price alone because the conditions "were material to its bid price" and "would have considerably increased the price" if omitted.[28]

When the purchase order varies from the sub-bid regarding only collateral terms, however, the general contractor may have reasonably relied upon the sub-bid. For example, in *Mead Associates v. Scottsbluff Sash & Door*, the Colorado Court of Appeals held a general contractor reasonably relied on a sub-bid despite including an additional indemnification clause in its purchase order.[29] The court reasoned that the purchase order "generally mimicked [the sub-bid] concerning the number, type, and cost of materials ordered, and the addition of the indemnification clause did not alter the substance of the underlying bid."[30] "Defendant had a right to reject the inclusion of the indemnification clause in plaintiff's purchase order but was still bound by the bid upon which defendant expected plaintiff to rely."[31]

This case resembles *Flintco Pacific* more than *Mead Associates*. Based on Colfax's testimony, the Court finds that the Purchase Order differed from the sub-bid in the Sales Agreement regarding material terms, including place of delivery and payment. While the Purchase Order matched the sub-bid's price, place of delivery and payment were conditions material to its bid price and would have considerably increased the price if omitted. Specifically, if the FOB factory term were omitted, Smith & Loveless would incur additional liability from

---

[27] *Id.* at 27.

[28] *Id.*

[29] 856 P.2d 40, 41 (Colo. Ct. App. 1993).

[30] *Id.* at 42.

[31] *Id.*

risk of loss through transit. Likewise, if the progress payment term were omitted, Smith & Loveless would incur additional expense in financing the custom-made equipment itself.

Furthermore, even if these terms were collateral and subject to further negotiation, the Purchase Order did not otherwise "generally mimic" the scope of the sub-bid. The Specifications require a separately mounted lighting panel, high performance painting and coating, and a cellular modem for the SCADA system. Instead of these selections, the Sales Agreement proposed its standard options.

In addition to these differences, the parties dispute whether the Sales Agreement included VFDs and air conditioning units, which the Sales Agreement does not specifically include nor specifically exclude. Smith & Loveless contends that VFDs are an optional item, and the Sales Agreement did not mention VFDs or their component parts. PKG contends that it installs VFDs on almost every job, and it believed the Sales Agreement to cover them because VFDs did not appear on the list of items not included.

The case *Haselden-Langley Constructors v. D.E. Farr & Associates*[32] is instructive here. There, the general contractor sought sub-bids matching the project plans and specifications for masonry and rigid, in-wall insulation.[33] The subcontractor submitted a bid of $204,394 for masonry work, but the general contractor assumed the sub-bid included both masonry and insulation.[34] The court determined it was not reasonable for the general contractor to assume the

[32] 676 P.2d 709 (Colo. App. 1983).

[33] *Id.* at 710.

[34] *Id.*

sub-bid included insulation.[35] The sub-bid was "expressly limited to masonry work only," and "did not include any labor or materials for the installation of rigid, in-wall insulation."[36]

Here, like the sub-bid in *Haselden-Langley*, the Sales Agreement did not suggest that it included VFD's and air conditioning units. The Sales Agreement did not include "any labor or materials" for the installation of VFDs. As LaRue testified, VFDs require more than just the VFD mechanism. Installation would also require fabrication, programming, and a larger controls cabinet or multiple controls cabinets. The Sales Agreement, however, did not include any of these necessary items or labor. Just as it was unreasonable for the general contractor to assume the sub-bid included insulation in *Haselden-Langley*, it was unreasonable for PKG to assume the Sales Agreement included VFDs and air conditioning units. Accordingly, despite using the price of the Sales Agreement in its own bid, PKG did not reasonably rely upon Smith & Loveless' sub-bid.

Moreover, due to these material variances from the Sales Agreement, the Purchase Order did not preserve a promissory estoppel claim under *Drennan*. Under basic principles of contract formation, an offeree must accept the offer unconditionally and without variance, otherwise it operates as a rejection and a counteroffer.[37] Applying this principle to the *Drennan* rule, the District Court for the Northern District of Georgia held a counteroffer will terminate the general contractor's power of acceptance, even if the general contractor sought to eventually accept the

[35] *Id.* at 711.

[36] *Id.*

[37] *Lindsey Masonry Co. v. Murray & Sons Constr. Co.*, 390 P.3d 56, 58 (Kan. Ct. App. 2017) ("An acceptance of a contract must mirror the terms of the offer. A conditional acceptance is a counteroffer that rejects the original offer.").

sub-bid.[38] Similarly, the Seventh Circuit held the general contractor "[knows], or at least should have known, that the negotiations could fall apart before the parties entered into a binding agreement."[39] Accordingly, under the *Drennan* rule, the Purchase Order constituted a counteroffer, which terminated PKG's power of acceptance.[40]

Accordingly, despite using the price of the Sales Agreement in its own bid, PKG did not reasonably rely upon Smith & Loveless' sub-bid. PKG ignored material elements of the Sales Agreement in drafting its own bid and Purchase order, which did not preserve a promissory estoppel claim.

**IT IS THEREFORE ORDERED BY THE COURT** that judgment be granted in favor of Defendant Smith & Loveless.

**IT IS SO ORDERED.**

Dated: November 22, 2022

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE

---

[38] *See APAC-Se., Inc. v. Coastal Caisson Corp.*, 514 F. Supp. 2d 1373, 1378 (N.D. Ga. 2017) (holding a non-conforming acceptance was counteroffer even if the subcontractor "never expected [the general contractor] to accept the bid unconditionally").

[39] *C.G. Schmidt, Inc. v. Permasteelisa N. Am.*, 825 F.3d 801, 803 (7th Cir. 2016).

[40] As an additional alternative argument, Smith & Loveless contends that PKG did not seek to accept the Sales Agreement until after the window of acceptance had closed. Because the Court finds that PKG did not reasonably rely upon the Sales Agreement, it need not address this argument.